UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TABITHA LOFTON, <br> Parent and Next Friend to T.C., a minor, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> Defendant. | Civil Action No. 13-1959 (RBW) |

**MEMORANDUM OPINION**

Plaintiffs Tabitha Lofton, on her behalf and on behalf of her minor son T.C., seek a temporary restraining order and preliminary injunction compelling the District of Columbia ("District") to reinstate T.C.'s enrollment at The Ivymount School ("Ivymount") in Rockville, Maryland, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482 (2012). In the memorandum in support of their motion, the plaintiffs allege that "[o]n May 21, 2013, District of Columbia Public Schools ("DCPS") unilaterally and without the consent or meaningful participation of Plaintiff Tabitha Lofton, determined to remove Ms. Lofton's son, T.C., from his educational placement at the Ivymount School ("Ivymount"), a private, entirely special education school in Rockville, Maryland, in violation of the [IDEA]." Memorandum in Support of Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction ("Pls.' Mem.") at 1. According to the plaintiffs, this decision "has placed T.C. into [Dunbar High School] . . . where he has been subject to physical harm, his safety is threatened on a daily basis, and he cannot possibly achieve educational success." Id. at 2. The

1

plaintiffs assert that because "there is a significant likelihood that [the p]laintiff[s] will succeed on the merits of her claims; Ms. Lofton and T.C. have suffered, and will continue to suffer, irreparable harm if T.C. is forced to continue attending Dunbar; and the balance of harms and public interest favor [the p]laintiffs," id., the Court should issue a temporary restraining order and preliminary injunction requiring "DCPS to pay for T.C. to attend . . . Ivymount . . . until . . . T.C.'s IEP Team is reconvened and properly determines to remove T.C. from Ivymount." Complaint for Declaratory and Injunctive Relief ("Compl.") ¶ 1.

The Court conducted a hearing on the motion on December 11, and December 16, 2013. During the hearing the District asserted that Dunbar High School ("Dunbar") was T.C.'s current educational placement and that, pursuant to the stay put provision of the IDEA, T.C. should be required to continue attending Dunbar until the issue of T.C.'s placement is permanently resolved. Def.'s Opp'n at 7-8; see 20 U.S.C. § 1415(j) ("[D]uring the pendency of [administrative due process hearings under § 1415], the child shall remain in the then-current educational placement of the child.") Since this Circuit has determined that a "child is entitled to an injunction only outside the stay-put provision . . . by establishing the usual grounds for such relief," Anderson v. Anderson, 877 F.2d 1018, 1024 (D.C. Cir. 1989), after careful consideration of the parties' motions[1] as well as evidence presented during the December 11 and 16, 2013

---

[1] The Court considered the following documents in rendering its decision: (1) the Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Compl."); (2) the Hearing Officer's Determinations of October 30, 2013 ("HOD"); (3) the Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction; (4) the Defendant's Opposition to Plaintiffs' Motion for a Temporary Restraining Order ("Def.'s Opp'n"); (5) the Plaintiff's Motion to File Amended Complaint; and (6) the November 27, 2013 Settlement Agreement.

hearings,[2] the Court concludes the T.C. meets the "usual grounds" for a temporary restraining order and preliminary injunction. Accordingly, for the following reasons, the DCPS is ordered to pay for T.C.'s attendance at and transportation to and from Ivymount until such time that a properly developed Individual Education Plan ("IEP") is developed for T.C. − one that includes Ms. Lofton's meaningful participation − addressing the services T.C. is entitled to receive and a location where <u>all</u> of those services can be provided.

## STANDARD OF REVIEW

Temporary restraining orders and preliminary injunctions are "extraordinary remed[ies] that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation and citation omitted). In determining whether to issue a temporary restraining order, the Court must apply the same standard that is applied to preliminary injunctions, <u>see, e.g.</u>, <u>Hall v. Daschle</u>, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009), which requires that "'[a] plaintiff seeking a preliminary injunction must establish [1] that [he or she] is likely to succeed on the merits, [2] that [he or she] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [his or her] favor, and [4] that an injunction is in the public interest.'" <u>Sherley v. Sebelius</u>, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008)) (some alterations in original). Because they are "extraordinary remed[ies]," temporary restraining orders and preliminary injunctions "should be granted only when the party seeking the relief, by

---

[2] The Court considered (1) the December 16, 2013 testimony of Tabitha Lofton; (2) the December 16, 2013 testimony of T.C.; and (3) the December 16, 2013 testimony of Dr. Davis.

3

a clear showing, carries the burden of persuasion." Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

The District of Columbia Circuit has applied a "sliding scale" approach in evaluating the temporary restraining order/preliminary injunction factors. Sherley, 644 F.3d at 392. Under this analysis,

> [i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. For example, if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success . . . Alternatively, if substantial harm to the nonmovant is very high and the showing of irreparable harm to the movant very low, the movant must demonstrate a much greater likelihood of success. It is in this sense that all four factors must be balanced against each other.

Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (internal quotation marks and citations omitted).[3]

Thus, the Court must assess the merits of the plaintiffs' request for a temporary restraining order and preliminary injunction as to each of the factors delineated above. As set forth more fully below, the Court concludes that a balancing of these factors weighs in favor of granting the relief requested by the plaintiffs.

---

[3] Several members of the Circuit have read the Supreme Court's decision in Winter to cast doubt on the continued validity of the sliding scale approach. See Davis, 571 F.3d at 1296 (Kavanaugh, J, joined by Henderson, J., concurring) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other things" (emphasis in original)); Sherley, 644 F.3d at 393 ("Like our colleagues, we read Winter at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" (quoting Davis, 571 F.3d at 1296 (concurring opinion))). But the Circuit has had no occasion to decide this question because it has not yet encountered a post-Winter case where a preliminary injunction motion survived the less rigorous sliding scale analysis. See Sherley, 644 F.3d at 393 ("We need not wade into this circuit split today because, as in Davis, as
(continued . . .)

**STATUTORY FRAMEWORK**

Under the IDEA, states and territories, including the District of Columbia, that accept federal educational funds must provide a free appropriate public education ("FAPE") to students with disabilities residing within their borders. See 20 U.S.C. § 1412(a)(1)(A). The IDEA defines a FAPE as an education which "[(A)] is provided at public expense, under public supervision and direction, and without charge; (B) meet[s] the standards of the State educational agency; (C) include[s] an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) [is] provided in conformity with the individualized education program required" under other provisions of the IDEA. Id. § 1401(9). Once a student is deemed eligible to receive services under the IDEA, a team which includes the parent or parents of the student, certain teachers, and a representative of the local educational agency develops an IEP for the student in accordance with the requirements of the IDEA. Id. §§ 1414(d)(1)(A), (B). In addition to developing the IEP, the student's team determines an appropriate educational placement for the student. See id. § 1414(e).

The IDEA provides that a parent may submit an administrative complaint to an educational agency "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child" and receive a hearing on the complaint conducted by an independent hearing officer. Id. §§ 1415(b)(6), (f). A party who is dissatisfied with the decision of the hearing officer may then file a civil action in federal district court seeking review of the hearing officer's decision. Id. § 1415(i)(2)(A). If the hearing officer or district court determines that the agency failed to provide

---

(. . . continued)
detailed below, in this case a preliminary injunction is not appropriate even under the less demanding sliding-scale analysis."). Thus, because it remains the law of this Circuit, the Court must employ the sliding scale analysis here.

the student with a FAPE, the officer or court may require the agency to reimburse the parents of the child for the cost of enrollment at a private institution. Id. § 1412(a)(10)(C)(ii).

**BACKGROUND**

The facts pertinent to this case are as follows.[4] T.C. is a seventeen-year-old resident of the District of Columbia who receives special education services under the IDEA. Pls.' Mem. at 2; Def.'s Opp'n at 2. T.C.'s November 2012 annual IEP mandated that he be provided twenty-seven and one half hours per week of specialized instruction outside of the general education environment, thirty minutes per week of occupational therapy outside of the general education environment, sixty minutes per week of speech-language pathology outside of the general education environment, and sixty minutes per week of behavioral support services outside of the general education environment. HOD ¶ 56. From September 2004 until December 3, 2013, T.C. was enrolled in Ivymount, a nonpublic special education day school, pursuant to his previous IEPs.[5] Id. ¶¶ 3, 5. T.C.'s previous IEPs listed a "separate day school" as T.C.'s educational placement and Ivymount was deemed an appropriate location where those services could be provided. Pls.' Mem. at 3.

On May 21, 2013, T.C.'s mother, teachers, service providers, and a DCPS representative met to determine T.C.'s 2013-2014 IEP. HOD ¶ 51. During that meeting, DCPS identified T.C. as a student who can receive services required by the IDEA in a DCPS school during the 2013-2014 school year. Id. ¶ 66. All members of T.C.'s IEP Team, including T.C.'s mother, protested this change in T.C.'s IEP, id. ¶¶ 62-65, and DCPS noted the IEP Team members' disagreement

---

[4] Several of the subtle points were developed during witness testimony presented during the December 16, 2013 hearing.

[5] T.C. was permitted to remain at Ivymount during Ms. Lofton's administrative appeal of the 2013-2014 IEP. As the 2013-2014 IEP was not completed until November, the Court infers that T.C. was being provided services at Ivymount and remained there in accordance with the 2012-2013 IEP.

with the change in placement, id. ¶ 68.  Nonetheless, on June 27, 2013, DCPS sent Ms. Lofton a letter informing her that T.C. would be assigned to Dunbar for the 2013-2014 school year.  Id. ¶ 71.

Ms. Lofton filed an administrative complaint on August 16, 2013, alleging that DCPS denied T.C. a FAPE by "significantly imped[ing] her opportunity to participate in the decision-making process."  Id. at 1.  An administrative hearing on her complaint was held on October 11 and 22, 2013.  Pls.' Mem. at 5.  During the hearing, Ms. Lofton and various other members of T.C.'s May 21, 2013 IEP Team testified that DCPS had predetermined to remove T.C. from his placement at a separate day school, and that regardless of what any of them said at the meeting, DCPS did not and would not meaningfully consider their opinions or factor them into the placement decision.  Id.

On October 30, 2013, the hearing officer found that DCPS had violated the IDEA by denying Ms. Lofton the opportunity to meaningfully participate in T.C.'s educational placement decisions and that the denial equated to a denial of T.C.'s right to a FAPE.  HOD at 10-12.  After finding that T.C. was denied a FAPE as a result of this omission, the hearing officer substituted her own findings to augment T.C.'s IEP and ordered that T.C. be transitioned to Dunbar.  Id. at 24; Pls.' Mem. at 7.

On December 3, 2013, T.C. began attending Dunbar.  Pls.' Mem. at 7.  T.C. testified that during his time at Dunbar, he has been repeatedly bullied and threatened.  Id.; December 16, 2013 Testimony of T.C. ("T.C.'s Testimony").  T.C. also testified that he was physically assaulted in the hallway on one of those occasions by another student who demanded that he give the assailant some money.  T.C.'s Testimony.  Dr. Courtney Davis, Dunbar's Special Education Coordinator, testified that prior to T.C.'s arrival at Dunbar, the professional responsible for

7

providing occupational therapy resigned and has not yet been replaced. December 16, 2013 Testimony of Dr. Davis. Thus, to date, T.C. has not been provided occupational therapy at Dunbar. Id. Dr. Davis also acknowledges that she is uncertain whether T.C. has been included in authorizations to receive occupational therapy from an outside provider. Id. Moreover, Dr. Davis stated that she is also unable to ascertain when these services will be provided to T.C. Id.

Six days after T.C.'s first day at Dunbar, Ms. Lofton filed her judicial complaint, and a motion requesting a temporary restraining order and preliminary injunction due to what has occurred during T.C.'s tenure at Dunbar. Compl. at 1. As noted earlier, the hearing on the motion was held by this Court on December 11 and 16, 2013.

## LEGAL ANALYSIS

### A. Likelihood of Success on the Merits

The primary tool for ensuring that the student is provided a FAPE is the child's IEP. See Honig v. Doe, 484 U.S. 305, 311 (1988) ("[t]he primary vehicle" and "centerpiece of the statute's education delivery system" is the IEP). "Once the IEP is developed, the school system must provide an appropriate placement that meets those needs and, if an appropriate public placement is unavailable, the school system must provide an appropriate private placement or make available educational-related services provided by private organizations to supplement a public placement." Petties v. District of Columbia, 238 F. Supp. 2d 114, 116 (D.D.C. 2002) (citing 20 U.S.C. § 1412(a)(10); 34 C.F.R. §§ 300.349, 300.400-402 (2012)). In order to provide a student with a FAPE, the student's education must be "provided in conformity with the IEP" developed for him, and therefore, the educational agency must place the student in a setting that is capable of fulfilling the student's IEP. 20 U.S.C. § 1401(9); 34 C.F.R. § 300.116 (2012) (providing that the child's educational placement "[i]s based on the child's IEP").

8

The plaintiffs' motion and supporting memorandum combined with evidence presented on the December 16, 2013 hearing date indicate that DCPS is presently violating T.C.'s right to a FAPE by placing him at Dunbar. Aside from the fact that the hearing officer concluded that DCPS violated T.C.'s right to a FAPE by preventing his mother from meaningfully participating in the development of his IEP,[6] it is critical to note that, in this case, T.C.'s IEP <u>cannot</u> currently be implemented at Dunbar. Specifically, T.C.'s 2013-2014 IEP requires that he be provided 30 minutes of occupational therapy per week, and Dr. Davis testified that the school is currently unable to provide occupational therapy services.

As noted earlier, during her December 16, 2013 testimony, Dr. Davis indicated that prior to T.C.'s enrollment at Dunbar, the professional responsible for providing occupational therapy at Dunbar resigned. At the present time, T.C. is not receiving services that DCPS is required to provide in conformity with the IEP. Although DCPS has received permission to send students to outside providers to receive occupational therapy, Dr. Davis could not definitively recall if T.C. had been included in the list of students authorized to receive these services. Furthermore, she

---

[6] In addition to ensuring that a student is properly placed, the IDEA mandates that the parent be allowed to meaningfully participate in the development of his or her child's IEP. See 34 C.F.R. § 300.116(a)(1) (2012) ("The placement decision is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options.") Absent an uncooperative parent, meaningful participation is the cornerstone of the IEP process. See J.N. v. District of Columbia, 677 F. Supp. 2d 314, 320 (D.D.C. 2010) ("The IDEA guarantees parents of disabled children the opportunity to participate in the evaluation and placement process.") Ms. Lofton's inability to meaningfully participate in the May 2013 IEP therefore calls into question the validity of T.C.'s current IEP. See Spilsbury v. District of Columbia, 307 F. Supp. 2d 22, 25-26 (finding that because the parents did not agree with the changes made to their child's revised IEP, the prior IEP controlled what services the student would receive and where he would attend school until the challenged IEP could be evaluated and, if necessary, revised). Despite recognizing this deficiency, instead of referring the matter back to the IEP team for further evaluation of its decision, the Hearing Officer substituted her judgment for that of the IEP Team as to what effect the omission had on the validity of the May 2013 IEP. The Court's inability to substitute its own views for those of the IEP Team when confronted with a defective IEP raises serious questions about the propriety of the Hearing Officer's decision to unilaterally implement changes in a student's IEP without remanding the matter to the IEP Team. See D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564-65 (3rd. Cir. 2010) ("[A] court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time they were made."); R.E. v. New York City Dept. of Ed., 694 F.3d 167, 186 (2d Cir. 2012) (ruling that the

(continued . . .)

could not provide a timeframe for when students (and in particular T.C.) would begin receiving services from outside providers. While the Court appreciates Dr. Davis's candor, this uncertainty is not acceptable. Thus, since the services mandated in T.C.'s IEP <u>cannot</u> be provided at Dunbar, the Court finds that T.C. and his mother will likely succeed on the merits of their case.

### B. Irreparable Harm

"A failure to provide a FAPE constitutes irreparable injury." <u>Massey v. District of Columbia</u>, 400 F. Supp. 2d 66, 75 (D.D.C. 2005). T.C. has a finite amount of time to receive educational services. Every week that T.C. is not receiving his occupational services is another week that T.C.'s educational progress is delayed and, DCPS cannot retroactively cure the harm caused by those missed weeks of required service. With regard to this second factor, the Court finds that that T.C.'s present and continued inability to receive occupational therapy will cause T.C. irreparable harm.

### C. Harm to the Defendants and Other Parties

With regard to this third factor, the Court does not find that the issuance of a temporary restraining order and preliminary injunction in this matter will cause substantial injury to the District. The temporary restraining order and preliminary injunction are narrowly tailored to ensure that their duration will remain in force only until such time that a properly developed IEP is adopted and a location is selected that can provide <u>all required services</u> T.C. is entitled to receive pursuant to that IEP. Furthermore, by removing T.C. from Dunbar, the Court is facilitating DCPS's adherence to the IDEA. The Court therefore concludes that the District's

---

(. . . continued)
IDEA does not allow a school district to "rehabilitate a deficient IEP after the fact" by showing that a child "would, in practice, have received the missing services," at the public placement).

compliance with the IDEA is not a harm, but rather is in its best interest, which also weighs in favor of issuing the requested relief.

### D. Public Interest

As to the final factor of the temporary restraining order/preliminary injunction analysis, it is evident from the record now before the Court that the public interest will be furthered by granting the requested relief. "The public interest lies in the proper enforcement of . . . the IDEA and in securing the due process rights of special education students and their parents provided by statute," and this public interest "out weigh[s] any asserted financial harm to DCPS." Petties, 238 F. Supp. 2d at 124 (granting preliminary injunctive relief).

### E. Balancing the Temporary Restraining Order Factors

In analyzing the four factors discussed above, the Court is persuaded that the plaintiffs have demonstrated that they are entitled to the injunctive relief requested. The two most significant factors in this case to the Court's decision – the plaintiffs' likelihood of success on the merits and the threat of irreparable harm – weigh heavily in favor of the plaintiffs. The Court finds, moreover, that it would be serving the public interest of the IDEA by granting the requested relief, and that doing so will not subject the defendant to any harm. In sum, the Court's analysis of the various considerations in deciding whether to grant the requested relief leads to the conclusion that the plaintiffs' motion for a temporary restraining order and preliminary injunction must be granted.[7]

---

[7] Federal Rule of Civil Procedure 65(c) authorizes the issuance of a temporary restraining order "only if the movant gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The District of Columbia Circuit has interpreted this rule to authorize this Court "to [both] set the amount of security [and] to dispense with any security requirement whatsoever where the restraint will do the defendant no material damage." Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n, 636 F.2d 755, 759 (D.C. Cir. 1980) (internal quotation marks omitted). As noted above, the Court finds that the temporary restraining order here will not cause the defendants any "material damage." The Court, therefore, will not require the plaintiffs to post any security before this Order takes effect.

## CONCLUSION

For the foregoing reasons, the Court grants the plaintiffs' motion for a temporary restraining order and a preliminary injunction.[8]

**SO ORDERED** this 20th day of December, 2013.

REGGIE B. WALTON<br>United States District Judge

---

[8] The Court will contemporaneously issue an Order consistent with the Memorandum Opinion.